# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF NEW YORK

NICOLE CARRERA on behalf  §
of V.M.C.,                 §
                           §
          *Plaintiff*,     §
                           §
*versus*                   §     CIVIL ACTION NO. 1:13-1414
                           §
CAROLYN W. COLVIN,         §
Acting Commissioner of     §
Social Security,           §
                           §
          *Defendant*.     §

## REPORT AND RECOMMENDATION

Nicole Carrera ("Carrera"), invoking subject-matter jurisdiction under 42 U.S.C. § 405(g), complains of the denial of an application for supplemental security income ("SSI")[1] filed on behalf of a minor child, "VMC."[2]  A reviewing court's limited role is to determine whether (a) the Commissioner applied proper legal standards and (b) the decision is supported by substantial evidence.  *See Lamay v. Commissioner of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009), *cert. denied*, 559 U.S. 962 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see also* 42 U.S.C. § 405(g).  Courts cannot retry factual issues *de novo* or substitute their interpretations of administrative records for that of the Commissioner when substantial evidence supports the decision.  *Yancey v. Apfel*,

---

[1] "The purpose of providing SSI benefits to minor children is to provide benefits to children while they are children, thus enabling them as 'among the most disadvantaged of all Americans,' to enter society as 'self-supporting members.'" *Maldonado v. Apfel*, 55 F. Supp.2d 296, 307 (S.D.N.Y. 1999) (quoting H.R.Rep. No. 92-231 (1971), reprinted in 1972 U.S.C.C.A.N. 4989, 5133–34).

[2] In accordance with Rule 5.2(a) of the Federal Rules of Civil Procedure and 8.1 of the Local Rules for the Northern District of New York, the minor in whose behalf the application was filed is referred to by initials.

145 F.3d 106, 111 (2d Cir. 1998). Neither can they overturn administrative rulings because they would have reached a different conclusion had the matter come before them in the first instance. *See Campbell v. Astrue*, 465 Fed. App'x 4, 5 (2d Cir. 2012) (summary order).

# I. Background

VMC, born in 2001, resided with her mother and two brothers (one 2 years older and the other one year younger) at all material times. According to Carrera, all three siblings have autism, with VMC being the highest functioning of all three. Originally from Long Island, New York, the family relocated to Florida and then North Carolina, where they resided until December 2008.[3] While in North Carolina, the family was exposed to domestic violence by Carrera's spouse, a convicted felon, who violated a protective order and threatened to kill Carrera. (T. 318-19). By family court order, Rensselaer County, New York, in spring 2009, Carrera was granted sole legal and physical custody of the children, and their father was ordered to have no contact. (T. 311-16). The family has changed its last name, social security numbers, and relocated to upstate New York. (T. 208-09). The address has been kept confidential. (T. 60-61).

VMC received special education for "global delays" before entering Kindergarten. She was classified and received services under autism through her 3d grade school year. Specifically, she received support from a consultant teacher on a daily basis for 40 minutes, and two program modifications.

In a reevaluation for special education services conducted prior to entering 4th grade, in August 2010, a Special Education Committee found she no longer

---

[3]     In a Report of Contact found in the administrative record, dated June 23, 2010, it is noted that Carrera is a victim of domestic violence whose abuser has stalked her and attempted to murder her when he found her after relocating initially from New York to Florida and again after relocating to North Carolina.

required academic support through special education and declassified her. She was placed in general education but continued to receive extended time on tests longer than 30 minutes.

## II.  Claim

In August 2008, when VMC was seven years old and entering the second grade, Carrera applied in VMC's behalf for disability-based supplemental security income benefits. Carrera identified autism, Asperger's Disorder,[4] Attention Deficit/Hyperactivity Disorder ("ADHD"), and sleep disorder as VMC's disabling impairments.

VMC's case was assigned to administrative law judge Arthur Patane ("ALJ Patane"), who conducted an evidentiary hearing in December 2010. (T. 34, 55-74). Carrera and VMC appeared, along with counsel. (*Id.*). ALJ Patane received into evidence (a) testimony from Carrera and VMC, (b) forensic reports from state agency consultants, and (c) VMC's medical and school records. (*Id.*).

## III.  Commissioner's Decision

*A.   Adjudicative Protocol*

The governing statute provides that:

> *[a]n individual under the age of 18* . . . [may receive supplemental security income benefits] . . . . if that individual has a *medically determinable . . . mental impairment, which results in marked and severe*

---

[4]     Asperger's Syndrome is a developmental disorder akin to autism with the following characteristics: "Language and cognition generally better than in autism; socially isolated and often viewed as odd or eccentric; clumsiness; repetitive patterns of behavior, interests, and activities; atypical sensory responses (*e.g.*, exquisite sensitivity to noises, food odors or tastes, or clothing textures); pragmatic deficits (*e.g.*, extremely concrete use of language or difficulty recognizing irony or jokes)." *Luckett v. Astrue*, No. 2:09-cv-00037 KJN, 2010 WL 3825703, at *1, n.4 (E.D. Cal. Sept. 28,2010)(quoting *Mark H. Beers, M.D ., et al.*, eds., The Merck Manual of Diagnosis and Therapy 2487 (Merck Research Labs., 18th ed. 2006) ("Merck Manual")).

*functional limitations*, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i) (emphasis added). To apply these statutory standards pragmatically to submitted claims, the Commissioner has established by regulation a three-step sequential analysis for determining whether a child is disabled for purposes of children's benefits:

1. Is the child engaged in any substantial gainful activity? If so, benefits are denied.

2. Does the child have a medically severe impairment or combination of impairments? If not, benefits are denied.

3. Does the child's impairment meet, medically equal, or functionally equal any in the Listing of Impairments, Appendix 1 of 20 C.F.R. Pt. 404, Subpt. P, 20 C.F.R. § 416.924(a)?[5] If so, benefits are granted.

20 C.F.R. § 416.924(a)-(d).

When an impairment does not medically *equal* any of the "Listing of Impairments," it is evaluated next for *functional equivalence*. An adjudicator considers how a child functions in everyday-life activities segregated for analytical purposes into "domains" delineating "broad areas of functioning intended to capture all of what a child can or cannot do." 20 C.F.R. § 416.926a(b)(1). The domains are:

(i) Acquiring and using information;

(ii) Attending and completing tasks;

(iii) Interacting and relating with others;

(iv) Moving about and manipulating objects;

---

[5] The Commissioner publishes a series of listed impairments describing a variety of physical and mental conditions, indexed according to the body system affected. 20 C.F.R. Pt. 404, Subpt. P, App. 1 (the "Listings"). Listed impairments are presumptively disabling. See 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

(v)     Caring for yourself; and,

(vi)     Health and physical well-being.

20 C.F.R. § 416.926a(b)(1)(i)-(vi).  To functionally equal an impairment in the listings, an impairment must result in "marked" limitations[6] in *two* domains of functioning or an "extreme" limitation in *one*.[7] 20 C.F.R. § 416.926a(d).

    When reviewing a child's impairments for functional equivalency, adjudicators must consider "all of the relevant evidence,"[8] and employ a "whole child" approach.  This requires administrative law judges to consider a child's everyday activities, determine all domains involved in performing them, consider whether that child's medically determinable impairment accounts for limitations in activities, and determine what degree such impairment limits that child's ability to function age-appropriately in each domain.[9]

---

[6]     A "marked" limitation" interferes seriously with ability to independently initiate, sustain, or complete activities. *See* 20 C.F.R. § 416.926a(e)(2)(i).

[7]     An "extreme" limitation means "more than marked," and represents an impairment which "interferes very seriously with . . . ability to independently initiate, sustain, or complete activities," and this rating is only "give[n] to the worst limitations." 20 C.F.R. § 416.926a(e)(3).

[8]     "All of the relevant evidence" includes objective medical evidence and other relevant evidence from medical sources; information form other sources, such as school teacher, family members, or friends; the claimant's statement (including statements from the claimant's parent(s) or other caregivers); and any other relevant evidence in the case record, including how the claimant functions over time and in all setting (*i.e.*, at home, at school, and in the community). SSR 09-2p, Title XVI: Determining Childhood Disability–Documenting A Child's Impairment–Related Limitations, 2009 WL 396032, at *11 (SSA Feb. 18, 2009).

[9]     *See* SSR 09-1p, Title XVI: Determining Childhood Disability Under The Functional Equivalence Rule–The "Whole Child" Approach, 2009 WL 396031, at *2-3 (SSA Feb. 17, 2009).

*B.      ALJ Patane's Decision*

ALJ Patane faithfully applied the evaluative protocol described above when deciding Carrera's application in behalf of VMC. At Step 1, ALJ Patane found that VMC had not engaged in substantial gainful activity at any time since August 29, 2008, the application date. At Step 2, ALJ Patane determined that VMC has severe impairments of autism, Asperger's Disorder, ADHD, and sleep disorder. At Step 3, ALJ Patane first considered whether VMC's impairments met or medically equaled criteria of the Commissioner's Listing 112.10 for Autistic Disorder and Other Pervasive Developmental Disorders, and determined that they did not because they were "not attended with specific clinical signs and diagnostic findings required to meet the requirements set forth in any of the child or adult listings."[10] (T. 37).

---

[10]      To meet requirements of this listing, a child first must have an autistic disorder or other pervasive development disorder characterized by "qualitative deficits" in development of reciprocal social interaction, verbal and nonverbal communication skills, and imaginative activity. In addition, the child must exhibit a markedly restricted repertoire of activities and interests (Paragraph "A" criteria). *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 112.10(A). Second, the child must establish that her disorder results in at least two marked impairment-related functional limitations (Paragraph "B" criteria). *Id.*, at § 112.10(B).

"B" criteria "describe impairment-related functional limitations." 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(A). To establish the B criteria for Listing 112.10, for children (age 3 to attainment of age 18), there must be at least two of the appropriate age-group criteria in paragraphs B2 of 112.02. *See id.*, at § 112.10(B). Paragraph B2 of 112.02 states "B" criteria as follows:

   a.   Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

   b.   Marked impairment in age-appropriate social functioning, documented by history and medical findings (including
                                                            (continued...)

ALJ Patane next compared VMC's impairments to the prescribed functional-equivalence domains. ALJ Patane found that VMC has *less than marked limitations* in the first five domains (*i.e.*, acquiring and using information; attending and completing tasks; interacting and relating with others; moving about and manipulating objects; and caring for yourself) and *no limitations* in the sixth domain (*i.e.*, health and physical well being). When making these findings, ALJ Patane considered VMC's *improved school performance* and *withdrawal from special education classes* upon entering fourth grade to be especially significant.[11]  (T. 44-46).

Because VMC did not demonstrate two marked domain limitations or one extreme limitation, ALJ Patane concluded that VMC does not have an

_____

[10](...continued)
        consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

    c.    Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

    d.    Marked difficulties in maintaining concentration, persistence, or pace.

*Id.*, at § 112.02(B)(2)(a)-(d).

[11]    Under Domain 1 (acquiring and using information), ALJ Patane noted that "[i]n August 2010, the Subcommittee on Special Education concluded that the claimant's cognitive and academic abilities were good enough that she no longer needed or was qualified to receive special education services."  (T. 44).  Under Domain 2 (attending and completing tasks), ALJ Patane found, "[a]s noted above, the claimant was recently found ineligible to receive any special education services for problems functioning in this or any other domain."  (T. 45).  Under Domain 3 (interacting and relating to others), ALJ Patane concluded, "[a]s noted throughout this decision, by August 2010, despite her diagnosed impairments, the claimant's overall functioning had improved to such a degree that she was no longer eligible to receive any special education services."  (T. 46).

impairment or combination of impairments functionally equaling a listed impairment. And, having previously determined that VMC's impairments neither met or medically equaled a listed disability, ALJ Patane concluded that VMC was not disabled.

Carrera's claim was denied in a written decision issued on February 3, 2011.

## C. *Appeals Council Action*

Carrera timely requested Appeals Council review of ALJ Patane's decision. While her request was pending before the Appeals Counsel, Carrera proffered additional evidence consisting of 9 pages of medical treatment records from treating pediatrician, Scott C. Bello, M.D., of Capital Care Medical Group, dated January 2012 to May 2013, and 46 pages of educational records from Granville School District dated December 2011 to May 2013.[12]

On November 11, 2013, approximately two years and nine months after ALJ Patane's decision, the Appeals Council denied Carrera's request for review. It stated that Carrera's new evidence did "not provide a basis for changing the Administrative Law Judge's decision" (T. 1), and explained:

> The Administrative Law Judge decided your case through February 3, 2011. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before February 3, 2011.
>
> If you want us to consider whether you were disabled after February 3, 2011, you need to apply again. We are returning the evidence to you to use in your new claim.

(T. 2).

---

[12]    Attached as Appendix A to Plaintiff's Brief.

# IV.  Points of Alleged Error

Upon receiving notice of the Appeals Council's denial of her request for review, Carrera timely instituted this case, represented by counsel.  Carrera's brief presents three denominated points of error, as follows:

1.  The Administrative Law Judge committed reversible error in failing to find the combination of Plaintiff's autism and attention deficit disorder meet or equal the listing  found at 20 C.F.R., Part 404, Subpart P, Appendix 1 at Section 112.10 for autistic disorder and other pervasive developmental disorders;

2.  The Administrative Law Judge committed reversible error in failing to find Plaintiff has marked impairments in the domains of attending and completing tasks, interacting and relating with others, and caring for herself; and

3.  The decision of the Administrative Law Judge is against the substantial weight of the evidence and is incorrect as a matter of law.

(Dkt. No. 11, p. 2).

# V.  Discussion and Analysis

Although the *focus* of Carrera's arguments varies somewhat in each of her proffered points of error, the *central thrust* of all her arguments is that ALJ Patane erred in concluding that VMC was not disabled because Carrera presented good and sufficient evidence to satisfy the sequential Step 3 requirement that a child's impairment "meet, medically equal or functionally equal" a presumptively-disabling listed impairment.  At worst, such arguments invite the court to exceed its narrow authority by reweighing evidence and coming to a different conclusion.  At best, they are misdirected.  The governing circuit court of appeals recently explained that "whether there is substantial evidence supporting the [claimant]'s view is not the question."  *Bonet ex rel. T.B. v. Colvin*, 532 Fed. App'x 58, 59 (2d Cir. 2013) (summary order).  Rather, the

court "must decide whether substantial evidence supports *the ALJ's decision*." *Id.* (emphasis in original).

"Substantial Evidence" is a term of art meaning less than a "preponderance" (usual standard in civil cases), but "more than a mere scintilla," or "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Richardson v. Perales*, 402 U.S. 378, 401 (1978); *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir.2004). To be "substantial," evidence need only be "enough to justify, if the trial were submitted to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury." *National Labor Relations Bd. v. Columbian Enameling & Stamping Co.*, 306 U.S. 262, 299–300 (1939) (cited in Harvey L. McCormick, Social Security Claims and Procedures § 672 (4th ed. 1991)). Given this, Carrera's irregular approach, *i.e.*, emphasizing evidence *supporting* her claim, can succeed only if there is *no contrary evidence* a reasonable mind might accept as adequate to establish factual findings made by ALJ Patane. It requires a showing of either a total lack of evidence supporting those findings, or a showing that evidence supporting Carrera's view is so overwhelming, while evidence to the contrary is so sparse, weak or incredible, that a finding based thereon is patently unreasonable.

Entwined and deeply imbedded within Carrera's misdirected contentions are some arguments cognizable under traditional substantial evidence analysis. These generally relate to the degree of weight ALJ Patane afforded to evidence from various evidentiary sources. Specifically, Carrera argues that ALJ Patane erred when giving "great weight" to evidence from a non-examining state agency

psychological consultant, Lori Brandon Souther, Ph.D.,[13] while only giving "substantial weight" to evidence from a treating pediatrician, Scott C. Bello, M.D., F.A.A.P,[14] and no specific quantum of weight to evidence from a school psychologist, Hope Saulter, Ph.D.[15] Carrera also maintains that ALJ Patane erred by failing to explain reasons for not finding credible Carrera's subjective testimony and written reports about the severity of VMC's symptoms.

First, there was no error in assigning great weight to Dr. Souther's evaluation. State agency psychological consultants are highly qualified experts in Social Security disability evaluation. *See* 20 C.F.R. § 416.927(e)(2)(i). Their opinions can be given weight, even greater weight than opinions of treating physicians, when, as here, they are supported by substantial evidence. *See, e.g., Netter v. Astrue*, 272 Fed. App'x 54, 55–56 (2d Cir. 2008) (summary order).

Second, Carrera's complaints about ALJ Patane's relative weighting of the evidence lacks substance. Carrera fails to identify any opinions of Dr. Bello and

---

[13] Dr. Souther reviewed the evidence of record on January 28, 2009, as part of an initial disability determination explanation in this case. In a Childhood Disability Evaluation, Dr. Souther found that VMC has impairments of ADHD and Autistic Disorder and Other Pervasive Developmental Disorders, but that they do not meet, medically equal, or functionally equal any listed impairment. (T. 384-89).

[14] Dr. Bello, a board-certified pediatric developmental behavioral health physician, treated VMC between April, 2009, and September 14, 2010. He submitted a letter in behalf of Carrera's application stating that VMC has high-functioning autism (Asperger's Syndrome) which interferes with her behaviors in the social domain as well as in the adaptive (activities of daily living domain). Dr. Bello observed that VMC's self-help skills appeared to be better in the school setting due to the high structure of the classroom, but that VMC's ability to take care of her personal needs in an age-appropriate manner while at home was seriously impaired. He also noted that VMC needed constant supervision when at home. (T. 411).

[15] Dr. Saulter reviewed results of psychological tests, teacher and parent interviews and VMC's "presentation" when VMC was a Kindergarten student. She concluded that VMC met the diagnostic criteria for an autism spectrum disorder, but the VMC's condition was relatively mild, and VMC was considered "high functioning." Based on that evaluation VMC was found eligible to receive special education services. (T. 342-50).

Dr. Saulter that support medical of functional equivalency to the Listing at issue. Carrera also fails to demonstrate that ALJ Patane *rejected* Dr. Bello's or Dr. Saulter's assessments in any material respect. Although ALJ Patane used the term "great weight" when referring to Dr. Souther, and "substantial weight" when referring to Dr. Bello, ALJ Patane affirmatively *relied* on Dr. Bellows's May 2010 letter that describes VMC as having "high-functioning autism, specifically Asperger's Syndrome" (T. 40, 411) as well the Kindergarten psychological report from Dr. Saulter (T. 41, 342-50) to conclude that VMC did not exhibit evidence of marked or extreme functional limitations in domains 2, 3, and 5.

There is considerable doubt that evidence lifted up for consideration by Carrera could be viewed as sufficient to meet all requirements of Listing 112.10.[16] But even if it were, there was contrary competent evidence that ALJ Patane found more persuasive in the exercise of sound discretion. VMC consistently was assessed with average cognitive skills in both 2007 (Dr. Saulter) and 2010 (psychologist Ovitt). (T. 338, 345). VMC was able "to get along well" with other students, was noted to be "social," like talking with others, and engaged in "extensive conversations" with other classmates, and had spent a good part of her summer vacation with a close friend. (T. 46, 65, 294, 304). School records consistently emphasized that VMC was able to care for herself, and participated in a wide range of activities with very little support. (T. 45, 49, 178, 294, 304, 338, 356-58). Occupational therapy evaluations in 2008 and 2010 reported that she did not require services. (T. 178, 356-58). Finally, school

---

[16] Carrera advocates that her evidence showed marked limitations in two "B criteria" categories under the Listing, but points to no evidence satisfying the predicate requirements of "qualitative deficits in the development of reciprocal social interaction; qualitative deficits in verbal and nonverbal communication and in imaginative activity; and markedly restricted repertoire of activities and interests." Listing 112.10(A)(1).

records showed that VMC had normal memory skills, average academic abilities and grades between a B+ and A+ on a 3d grade report card. (T. 43-45, 49, 294, 302-03, 324, 338, 360.

Third, Carrera's contention that her subjective testimony regarding the severity of VMC's symptoms and behaviors was not considered and/or improperly rejected by ALJ Patane lacks merit. ALJ Patane documented at length Carrera's testimony and written reports regarding VMC's symptoms and behaviors at home. (T. 38-39).

ALJ Patane clearly considered "all the relevant evidence" in the case record before reaching his decision. He set forth in conscientious and meticulous detail narrative summaries of the testimony of Carrera and VMC; diagnoses, opinions, and progress notes of VMC's pediatrician, Scott C. Bello, M.D., F.A.A.P.; the opinion of non-examining State agency pediatric consultant, Lori Brandon Souther, Ph.D.; educational records; questionnaires prepared by teachers (*e.g.*, Ms. Weaver, Ms. Parker, and Ms. Leroy); conclusions of school psychologists, Hope Saulter, Ph.D. and Heather B. Ovitt, M.A., C.A.S.; evaluations by occupational therapists, Dana Kropf and Danielle N. Ryerson; and findings by an August 2010 Subcommittee on Special Education that VMC no longer met the criteria for classification as a student with a disability, and was no longer eligible to receive special education services.

ALJ Patane then utilized the domain framework set forth *supra* in his inquiry into whether the VMC's impairments were functionally equal to a listed disability. With respect to functional-equivalent domain analysis, ALJ Patane made separate findings as to each domain. He cited substantial evidence supporting each finding. In short, ALJ Patane's written decision is an exemplary model of administrative competence and expertise. There is no

discernible or demonstrated legal error or evidentiary deficiency in ALJ Patane's decision based on the evidence before him.

## VI. Appeals Council Error

As reported earlier, Carrera's request for review remained pending for over two years and nine months before the Appeals Council acted. During that time, Carrera submitted additional evidence which the Appeals Council rejected. In this proceeding, Carrera argues:

> In light of the inordinately lengthy period this matter sat waiting to be reached for review, the *new and material evidence* should have been considered, *if for nothing less than administrative expediency and cost savings*.

(Dkt. No. 11, p. 20) (emphasis added). Congress has not authorized federal courts to overturn administrative actions lacking administrative expediency and cost efficiencies. Courts may, however, entertain complaints that new and material evidence was overlooked or improperly rejected.

### A. Role of Appeals Council; Authority to Consider New Evidence

The Appeals Council may review a case when (1) there appears to be an abuse of discretion by the administrative law judge, (2) there is an error of law, (3) the administrative law judge's findings are not supported by substantial evidence, or (4) there is a broad policy or procedural issue that may affect the general public interest. 20 C.F.R. § 416.1470(a). When reviewing a denial of SSI

benefits, the Appeals Council may consider "new and material"[17] evidence that the plaintiff presents. 20 C.F.R. § 416.1470(b).

Reviewing courts may order additional evidence to be taken before the Commissioner if (1) the evidence is new, (2) the evidence is material, and (3) there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004) (citing 42 U.S.C. § 405(g)); *see also* 20 C.F.R. § 416.1470(b); *Perez v. Chater*, 77 F.3d 41, 44-45 (2d Cir. 1996); *Rutkowski v. Astrue*, 368 Fed. App'x 226, 229 (2d Cir. 2010) (summary order). New evidence must not be "merely cumulative of what is already in the record." *Tirado v. Bowen*, 842 F.2d 595, 597 (2d Cir. 1988) (citation omitted). Material evidence is evidence that is probative and relevant to the claimant's condition during the time period for which benefits were denied. *Id*. Also, to be material, the evidence must also present a reasonable possibility that it would influence the Commissioner to decide claimant's application differently. *Id*. (citations omitted).

---

[17] Congress acted in 1980 to limit the power of district courts to order remands for "new evidence" in Social Security cases. *See Melkonyan v. Sullivan*, 501 U.S. 89, 100-01 (1991). Reviewing courts now may order that additional evidence be taken before the Commissioner:

> only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding....

42 U.S.C. § 405(g).

Consistent with the 1980 Amendment, the Commissioner promulgated a regulation relating specifically to Appeals Council review of new evidence. In addition to requiring that evidence be new and material, the regulation provides:

> (b) ... if new and material evidence is submitted, the Appeals Council shall consider the additional evidence *only where it relates to the period on or before the date of the administrative law judge hearing decision*.

20 C.F.R. § 416.1470(b) (emphasis added).

## B.    *Evidence Submitted to Appeals Council*

Additional evidence submitted by Carrera consisted of approximately 9 pages of treatment records from Dr. Bello dated January 2012 to May 2013. (Dkt. No 11, App'x A, pp. 47-54), and approximately 46 pages of records from Granville School District dated December 2011 to May 2013 (Dkt. No 11, App'x A, pp. 1-46).  Dr. Bello's progress notes during this period primarily reflect visits for medication refills.  (Dkt. No 11, App'x A, pp. 47-54), and appear to be largely cumulative.  Dr. Bello expresses no new opinions regarding VMC's functional limitations.[18]

The new educational records, however, indicate that VMC was reclassified as a student qualifying for special education services as a result of her autism. (Dkt. No 11, App'x A, pp. 3, 7).  VMC was provided an individualized education program ("IEP")[19] for the 2011-12 school year (5th grade), and received

---

[18]    The "treating physician rule" applies to the Appeals Council when it considers new evidence containing findings and opinions of a treating physician. *See Asturias v. Colvin*, No. 13-CV-143-JTC, 2014 WL 3110028, at *5 (W.D.N.Y. July 7, 2014); *Toth v. Colvin*, No. 5:12-CV-1532 (NAM/VEB), 2014 WL 421381, at *5 (N.D.N.Y. Feb. 4, 2014). Thus, when claimants submit to the Appeals Council treating-physician opinions on the nature and severity of their impairments during the relevant period of disability, "the treating physician rule applies, and the Appeals Council must give good reasons for the weight accorded to" that opinion. *James v. Commissioner of Soc. Sec.*, No. 06-CV-6180(DLI)(VVP), 2009 WL 2496485, at *10 (E.D.N.Y. Aug. 14, 2009). "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999) (citing *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998)). Further, "[i]t is insufficient for the Appeals Council to merely acknowledge that they reviewed new evidence from a treating physician without providing such reasoning." *Seifried ex rel. A.A.B. v. Commissioner of Soc. Sec.*, No. 6:13-CV-0347 (LEK/TWD), 2014 WL 4828191, at *4 (N.D.N.Y. Sept. 29, 2014) (citing *Shrack v. Astrue*, 608 F. Supp.2d 297, 302 (D. Conn. 2009)).

[19]    Under federal law (Individuals with Disabilities Education Act ("IDEA")), students with disabilities who meet federal and state requirements for special education receive instruction under an individualized education program. See 20 U.S.C. § 1400(d)(1) A).  "IEP" refers both to the educational program to be provided to a child with a disability and to the written document that describes that educational program.

integrated co-teaching services and psychological counseling services. (*Id.*, App'x A, pp. 3, 11). Educational records and standardized test results demonstrate that VMC continued to struggle in mathematics, functioning below standard. (*Id.*, App'x A, pp. 42-44).

VMC's general education teacher, Mr. Condon, reported *clinically significant concerns* in the area of *withdrawal* and at-risk concerns in the areas of learning problems, atypicality, leadership, and functional communication. (Dkt. No. 11, App'x A, pp. 27, 29). Ms. Brown, VMC's regular education math teacher, reported at-risk concerns in the areas of learning problems, atypicality, withdrawal, adaptability, social skills, leadership skills, study skills, and functional communication. (*Id.*). Recommendations for VMC included step-by-step instruction, preferential seating, additional test taking time, lined and graphed paper in math and writing assignments and help with organization of all materials. (*Id.*, App'x A, pp. 27-28). Both Mr. Condon and Ms. Brown reported VMC as:

> having difficulty concentrating/focusing, sustaining attention, completing homework, completing work in class, and displaying feelings appropriate. She has poor organizational skills, is unaware of social cues, and at times can be withdrawn.

(*Id.*, App'x A, p. 16).

Additionally, included with her educational records is an incident list, revealing that VMC received a five-day, out-of-school suspension for written threats toward another student, and a second incident in which VMC was made to write a letter of apology. (Dkt. No. 11, App'x A, p. 37).

*C.    Application*

   The evidence in question was generated *after* ALJ Patane's decision. The Appeals Council rejected it as irrelevant on that basis. The Second Circuit, however, holds that "medical evidence generated after an ALJ's decision cannot be deemed irrelevant solely because of timing." *Newbury v. Astrue*, 321 Fed. App'x 16, 18 n. 2 (2d Cir. 2009) (summary order) (citing *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004)). That is because "[e]xaminations and testing conducted after the ALJ's decision is rendered may still be relevant if they clarify a pre-hearing disability and/or diagnoses." *Sears v. Colvin*, No. 12–CV–570 (MAD/ATB), 2013 WL 6506496, at *6 (N.D.N.Y. Dec. 12, 2013) (citation omitted). Hence, categorical refusal to consider new and material evidence solely because it was created after the date of the administrative law judge's decision can constitute reversible error. *Pollard*, 377 F.3d at 193 ("Although the new evidence consists of documents generated after the ALJ rendered his decision, this does not necessarily mean that it had no bearing on the Commissioner's evaluation of [the Claimant's] claims. To the contrary, the evidence directly supports many of her earlier contentions regarding [the] condition. It strongly suggests that, during the relevant time period, [her] condition was far more serious than previously thought"); *see also Sergenton v. Barnhart*, 470 F. Supp.2d 194, 204 (E.D.N.Y. 2007) (remanding to consider post-hearing diagnostic evidence suggesting that impairment was substantially more severe than previously diagnosed).

   Here, the post-hearing evidence clearly was new, as it was not in existence when ALJ Patane conducted the evidentiary hearing or when he issued his decision. Nor is it cumulative. It indicates that reclassification in special education was warranted for VMC based on objective testing and teacher

observations based on the severity of VMC's autism, and that disciplinary measures were necessary due to repeated behavioral problems.

Because the records did not exist, Carrera had good cause for not presenting them earlier. *See Pollard*, 377 F.3d at 193 ("Because the new evidence submitted by [claimant] did not exist at the time of the ALJ's hearing, there is no question that the evidence is 'new' and that 'good cause' existed for her failure to submit this evidence to the ALJ."). The question boils down, then, to whether the new evidence was material.

Clearly, the post-decision educational records were probative and could influence the Commissioner or ALJ Patane to decide the case differently. ALJ Patane emphasized repeatedly that his findings were influenced heavily by evidence indicating that VMC no longer needed or was qualified to receive special education services. (T. 42-43, 44, 45, 46). The new evidence would dispel that notion.[20]

---

[20]    In her 6th grade year, VMC was classified and received services under autism with diagnoses of Asperger's Syndrome, ADHD and difficulty with math. (Dkt. No. 11, App'x A, p. 16). VMC's new IEP recommended additional services and accommodations. She receive integrated co-teaching services in math class on a daily basis for 40 minutes. It was further recommended that VMC participate in psychological counseling services once a week for 30 minutes. Several program modifications were directed, including: access to computer for lengthy assignments; preferential seating close to the teacher; use of graph paper to complete math problems to help organize her written math work and decrease errors in computation; use of special line paper for her writing assignments due to her difficulty with the size and spacing of her written work; check for understanding, such as ask to restate the directions of have her complete an example to ensure understanding of the task/material; additional examples of newly taught concepts, if needed; organizational system, such as the use of a portfolio or binder type file system to keep all classroom materials organized by color/subjects; and preset to changes in schedules or routines so must be sure VMC knows what changes are being made to her daily routine. (Dkt. No. 11, pp. 11-12). Additionally, she received testing accommodations of extended time; administration in a location with minimal distractions; access to computer and program; and use of additional paper. (Dkt. No. 11, pp. 12-13).

It also could have been interpreted as indicating more serious limitations in various domains. For example, Domain 3 (interacting and relating with others), could be interpreted differently by factoring VMC's five-day, out-of-school disciplinary suspension for making a written threat towards another student (Dkt. No. 11, App'x A, p. 37), and her one-day suspension for telling another student that she hates Chinese and Asian people. (*Id*.). Additionally, her teacher, Mr. Condon reported "clinically significant" concerns in the area of "Withdrawal." He reported that VMC "almost always has trouble making new friends and often avoids other children." (*Id*., p. 25). Another teacher, Mrs. Brown also reported "at-risk" concerns in the areas of "Withdrawal" and "Social Skills," noting VMC "never makes friends easily." (*Id*.). Given all this, an administrative adjudicator might find that VMC was extremely limited in her ability to interact and relate to other people.

Mr. Condon also reported "at-risk" concerns in the areas of Learning Problems, Atypicality, Leadership, and Functional Communication (Dkt. No. 11, App'x A, p. 27). Ms. Brown, VMC's regular education math teacher, also reported at-risk concerns in the areas of learning problems, atypicality, withdrawal, adaptability, social skills, leadership skills, study skills, and functional communication. In combination, this might significantly affect findings regarding additional domains (*e.g.*, acquiring and using information (Domain 1) and/or attending or completing tasks (Domain 2)).

The new evidence also is relevant to Domain 5 (caring for oneself). It reflects "clinically significant" concerns in the area of self-esteem and "at risk" concerns in the areas of attitude to school, depression, and relations with parent. (Dkt. No. 11, App'x A, p. 27). Hence, psychological counseling was added to her related services. (*Id*., p. 11).

A much closer question is whether the new evidence is material in the sense of pertaining to the VMC's condition *during the time period for which benefits were denied*. It is possible, of course, that the new evidence documents only that VMC's condition worsened with time, in which case it might not be relevant to VMC's condition during the time for which benefits were denied. Post-determination diagnoses may indicate only more recent onset of disability.

It is equally possible, however, that the new evidence clarifies a pre-hearing disability and suggests that, during the relevant time period, VMC's condition was more serious than previously thought. The evidence before ALJ Patane related to VMC's assessments from Kindergarten through third grade. The new evidence was developed when VMC was more mature and her condition, therefore, easier to diagnose and assess. Further, the new evidence tellingly may reveal that when VMC was subjected to increased demands and higher expectations of regular classes, her underlying deficiencies present all along were more exposed and put into new light.

A reviewing court cannot make that assessment. The Appeals Council's cursory, formulaic rejection of the evidence, unsupported by any legal or factual reasoning does not suffice. Accordingly, the proper course for this court is to remand the matter to the Commissioner for reconsideration in light of the new evidence.[21]

---

[21] *See Chavis v. Colvin*, No. 5:12-cv-1634 (GLS), 2014 WL 582253, at *3 (N.D.N.Y. Feb. 13, 2014)(internal quotations and citations omitted)(remanding due to Appeals Council's mishandling of new medical evidence and stating: "Because there is reasonable basis for doubting whether the Commissioner applied the appropriate legal standards, even if the ultimate decision may be arguably supported by substantial evidence, the Commissioner's decision is reversed and remanded for further administrative proceedings.").

## VII.   Recommendation

The Commissioner's decision should be REVERSED, and the case should be REMANDED pursuant to 42 U.S.C. § 405(g), sentence four,[22] to consider new evidence and for further proceedings in accordance with this recommendation.

## VIII.   Objections

Parties have fourteen (14) days to file specific, written objections to the Report and Recommendation.  Such objections shall be filed with the Clerk of the Court.

**FAILURE TO OBJECT TO THE REPORT, OR TO REQUEST AN EXTENSION OF TIME TO FILE OBJECTIONS, WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**

*Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Graham v. City of New York*, 443 Fed. App'x 657, 658 (2d Cir. 2011) (summary order); *FDIC v. Hillcrest Assocs.*, 66 F.3d 566, 569 (2d Cir. 1995); *see also* 28 U.S.C. § 636(b)(1), Rules 6(a), 6(e) and 72(b) of the Federal Rules of Civil Procedure, and NDNY Local Rule 72.1(c).

Signed on the __30__ day of ____January____ 2015.

*Earl S. Hines*

Earl S. Hines
United States Magistrate Judge

---

[22]     *See Sears v. Colvin*, No. 8:12-cv-570 (MAD/ATB), 2013 WL 6506496, at *4 (N.D.N.Y. Dec. 12, 2013) (sentence four as opposed to sentence six remand is appropriate); *see Titus ex rel. N.M.C. v. Astrue*, No. 09-CV-0093 (GTS/VEB), 2010 WL 3323738, at *5 (N.D.N.Y. July 6, 2010) (collecting cases).